205 So.2d 398

**Mary Estus WEBB, Administratrix of the Estate of Jesse L. Webb, Jr.,**

v.

**ZURICH INSURANCE COMPANY et al.**

No. 48550.

Dec. 11, 1967.

Rehearing Denied Jan. 15, 1968.

H. Alva Brumfield, Sylvia Roberts, Emile M. Weber, H. Alva Brumfield, III, Baton Rouge, for applicant.

Normann & Normann, Frank S. Normann, New Orleans, Robert L. Kleinpeter, Watson, Blanche, Wilson, Posner & Thibaut, Charles W. Wilson, Durrett, Hardin, Hunter, Dameron & Fritchie, Wallace A. Hunter, Baton Rouge, for respondents.

FOURNET, Chief Justice.

We granted a writ in this case, which was consolidated with that of Owen, Administratrix v. Zurich Insurance Company

et al., La., 205 So.2d 410,[1] in order that we might review the judgment of the Court of Appeals for the First Circuit reversing the district court judgments against the Sheriff of East Baton Rouge Parish awarding Mrs. Mary Estus Webb and Mrs. Frances Tucker Owen damages for the deaths of their respective husbands in the crash of a Cessna aircraft on April 28, 1956, allegedly caused by its negligent operation by a special deputy sheriff of that parish. La.App., 194 So.2d 436 and 441; 250 La. 258, 263, 195 So.2d 143, 145.

In order to properly dispose of the issues in this case it is necessary to give a résumé of the pertinent facts. The record reflects these to be that Sheriff Bryan Clemmons of East Baton Rouge Parish, in order to carry out more efficiently the duties of his office—such as transporting fugitives and prisoners, particularly to and from Angola State Penitentiary; investigating crimes; and creating good public relations between his office and city and state departments (of other states as well as Louisiana) whose mutual cooperation was necessary for the proper operation of his office, including the transportation of

officials of these other offices—traded in a Stinson station wagon airplane then owned by the sheriff's office for a Cessna 182 single engine airplane through the Hair Flying Service, Cessna's agent in Baton Rouge, delivery thereof being accepted on April 11, 1956.

Aware of the state's immunity from suit,[2] and the limitations of the bonds of the sheriff and his deputies, and desirous of protecting "any person who got in the airplane * * * against loss of life or serious injury" as the result of the ownership, maintenance, or use of the aircraft, Sheriff Clemmons secured through the Zurich Insurance Company's agent in Baton Rouge the day before the plane was accepted a policy covering property damage to and by the plane, and public liability coverage, the amount of the latter being limited to $500,000 for each accident. In this policy Paul O. Pittman, a private pilot licensed to fly a single engine plane, who was also a special deputy and unpaid head of the Sheriff's Air Squadron, was therein designated as the plane's pilot.

Under constitutional authorization,[3] the governments of the City of Baton Rouge

---

1. Alhough both Mrs. Webb and Mrs. Owen sued as the administratrix of the estate of their respective husbands, they sought to recover individually and also for their minor children.
2. Both Mrs. Webb and Mrs. Owen secured legislative authorization to sue the sher-

iff. The constitutionality of such authorization was challenged, but the record does not disclose any ultimate determination of this phase of the matter.
3. Section 3(a) of Article XIV of the Constitution of Louisiana, under the amendment authorized by Act 389 of 1946.

and the Parish of East Baton Rouge were fused into a unique metropolitan form of government known as a city-parish commission, of which Jesse L. Webb, Jr., was the mayor-president, although the office of the parish sheriff as a political subdivision of the state continued to function entirely separate therefrom, the limits of the city and parish not being co-extensive. Webb, together with the Sheriff and Dr. James Kimbrough Owen, a professor at Louisiana State University specializing in municipal government, planned to attend a national conference on metropolitan problems to be held at the Michigan State University in Lansing on April 28, 1956, the Sheriff, after determining Pittman's availability to pilot them, instructing him to work out the details of the flight with Webb. Because of the sudden illness of the Sheriff the night previous, the party left Baton Rouge the morning of April 28 without him and crashed later that evening, killing all occupants. Thereafter Zurich paid the sheriff's office for the loss of the plane, less a salvage estimate of $25. When Zurich denied liability for the deaths of Mayor Webb and Dr. Owen, their widows instituted these suits, joining as co-defendants, the Sheriff and Zurich as the plane's insurer.[4]

Counsel representing Zurich also represented the Sheriff, as required to do under the specific terms of the policy, filing separate but identical answers in which liability was denied. However, Zurich, on its own behalf, pleaded additionally, as a special defense, that under the exclusionary provisions of the policy the public liability arising from this accident was not covered inasmuch as "the pilot was in * * * violation of * * * Civil Air Regulations."

Subsequently, Zurich withdrew its representation of the Sheriff, who employed private counsel. Some nine months later, Zurich excepted to the petitions on the ground they disclosed neither causes nor rights of action. The basis for these exceptions is not set out in the pleadings, but they were predicated on the contention that the plaintiffs had no right of direct action against the company under Louisiana's direct action statute (R.S. 22:655) because the accident did not occur in Louisiana, and under the terms of the policy it could

This city-parish commission of metropolitan government was held to be constitutional in State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477.

4. In addition to the Sheriff and Zurich, plaintiffs also joined as parties defendant Cessna and its insurer, the Hair Flying Service as a partnership and the partners individually—J. D. Hair, Sr., and Jr.

By consent judgment J. D. Hair, Jr., who had no connection with the company, was released; the Hair Flying Service and J. D. Hair, Sr., were dismissed as of nonsuit; and the suit against Cessna and its insurer was dismissed after trial on the merits. No appeals were taken from any of these rulings and these parties are, therefore, no longer involved in this litigation.

not be joined as a party defendant in any action to determine the liability of its insured. These exceptions were referred to the merits.

■ Following trial on the merits, the trial judge rendered judgment (1) maintaining the exceptions of no cause and no right of action filed by Zurich and dismissing the suits as to it; and (2) in favor of Mrs. Webb for $234,412.11,[5] and favorable to Mrs. Owen for $208,698,[6] and against the Sheriff, subject, however, "to the limit of liability of the policy of Zurich Insurance Company issued" to him. Both the Sheriff and Zurich filed motions for a new trial, which were denied. Zurich alone appealed;[7] hence, the judgments against the Sheriff and in favor of Mrs. Webb and Mrs. Owen are now final. See, Bertucci v. Bertucci, 224 La. 364, 69 So. 2d 502; Oglesby v. Turner, 127 La. 1093, 54 So. 400.

Answering Zurich's appeal, Mrs. Webb and Mrs. Owen prayed that the judgments rendered on the merits releasing Zurich under its exceptions be reversed and the company cast in solido with the Sheriff. In addition, Mrs. Webb sought to have the award to her increased to $328,824.22

The Court of Appeals agreed with the trial court that no direct action would lie against Zurich under R.S. 22:655, and, despite the fact that the sheriff had not appealed from the judgment against him, which was then final, it reversed this judgment and dismissed the suits. These writs were granted to review this action. 250 La. 258, 263, 195 So.2d 143, 145.

■ We think a careful study of the historical development of the direct action statute in Louisiana will readily disclose that the appellate court, as did the district court, erroneously concluded the plaintiffs had no right of direct action against Zurich.

■ As presently written, the Louisiana direct action statute represents the culmination of a long developmental process which began with the passage of Act 253 of 1918, and, despite ingenuous legal arguments seeking to restrict its application, has been gradually expanded in scope by the legislature and the courts to enlarge the remedy thus made available to a person injured through the fault of a tortfeasor. The end result has been to make a fund directly available to one injured as the result of the acts of an insured, provided there are mini-

---

5. Of this amount $164,412.11 was awarded to Mrs. Webb individually, with her four minor children receiving $17,500 each.
6. Of this amount $156,198 was awarded to Mrs. Owen individually, with each of her three minor children receiving $17,500.
7. In the appellate court plaintiffs moved to have the Zurich appeal dismissed on the

ground it had no right to seek reversal of the judgment casting the Sheriff since he has not appealed, and it had succeeded in having the suits dismissed as to it under its exceptions after a trial on the merits. Their motions in this respect were denied. See, La.App., 185 So.2d 230, 232.

mum contacts in Louisiana. See, Davies v. Consolidated Underwriters, 199 La. 459, 6 So.2d 351; West v. Monroe Bakery, Inc., 217 La. 189, 46 So.2d 122; and Morrison v. New Hampshire Ins. Co., 249 La. 546, 187 So.2d 729.

In the Morrison case this court, in a well considered opinion, quoted with approval the following from the case of Travelers Fire Ins. Co. v. Ranney-Davis Mercantile Co., 10 Cir., 173 F.2d 844, cert. denied, 337 U.S. 930, 69 S.Ct. 1495, 93 L.Ed. 1737, which gives the rationale underlying this rule of law thusly: "All legislation making foreign corporations amenable to judicial process in the state in which they seek the privilege of doing business is predicated upon the right of the state to protect its citizens in their controversies with such corporations by requiring that the same be adjudicated in the courts of the state rather than compelling its citizens to travel to remote places to litigate such controversies. Judicial decisions upholding such legislation are likewise founded upon the same logic. No sound reason appears why the state should not have power to compel foreign corporations seeking entrance to the state to agree that while engaged in business under such license, the state courts should have jurisdiction of all controversies arising between it and the citizens of the state."

This now well established public policy recognizes the social importance of modern liability insurance in our highly industrialized society as a means whereby persons injured as the result of an accident may obtain financial relief, and that the policy against liability is not issued primarily for the protection of the insured but for the protection of the public. See, Davies v. Consolidated Underwriters, 199 La. 459, 6 So.2d 351, supra, and West v. Monroe Bakery, Inc., supra.

Originally, most accident policies afforded indemnity coverage only, containing what are commonly termed "no action" clauses which provide the insurer is not liable until the amount of the insured's obligation has been determined by a final judgment of court. At the time of its adoption, Act 253 of 1918[8] was designed to overcome the effect of such clauses where the insured became insolvent or bankrupt before the injured party could obtain or enforce a judgment against him, by providing, in essence, that the insolvency or bankruptcy of the insured would not release the

8. The pertinent portion of the 1918 act provides that " * * * after the passage of this act, it shall be illegal for any company to issue any policy against liability unless it contains a provision to the effect that the insolvency or bankruptcy of the assured shall not release the company from the payment of damages for injury sustained or loss occasioned during the life of the policy, and, in case of such insolvency or bankruptcy, an action may be maintained within the terms and limits of the policy by the injured person or his or her heirs, against the insurer company."

insurer from liability, and, in such case, the injured party was given a right of action against the insurer. The act of 1918 was amended by Act 55 of 1930[9] to broaden its scope by making executory judgments secured by an injured party against the insured prima facie evidence of his insolvency, and, further, giving the injured person or his heirs, at their option, a right of direct action against the insurer company either in the parish where the accident or injury occurred, or in the parish where the insured had his domicile. In 1948 the provisions of the 1918 act as amended in 1930 were carried verbatim into the Insurance Code created by the adoption of Act 195 of 1948 as Section 14.45, except for the fact that it was again enlarged to encompass not only policies that were *issued* in this state, but also those that were *delivered* in Louisiana, the 1918 act with its 1930 amendment then being repealed.[10]

Despite the fact that the state and federal jurisprudence under the 1930 act was to the effect that a direct action was available to the injured person even though the policy was issued and delivered in a foreign state (Stephenson v. List Laundry and Dry Cleaners, Inc., 182 La. 383, 162 So. 19;[11] and Rogers v. American Employers' Ins. Co., D.C., 61 F.Supp. 142),[12] Judge J. Skelly Wright of

9. Act 55 of 1930, so far as pertinent, provides: " * * * after the passage of this act, it shall be illegal for any company to issue any policy against liability unless it contains a provision to the effect that the insolvency or bankruptcy of the assured shall not release the company from the payment of damages for injury sustained or loss occasioned during the life of the policy, and any judgment which may be rendered against the assured, for which the insurer is liable, which shall have become executory, shall be deemed prima facie evidence of the insolvency of the assured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person or his or her heirs against the insurer company. Provided further that the injured person or his or her heirs, at their option, shall have a right of direct action against the insurer company within the terms, and limits of the policy, in the parish where the accident or injury occurred, or in the parish where the assured has his domicile, and said action may be brought either against the insurer company alone or against both the assured and the insurer company, jointly and in solido."

10. The only change made in the 1930 act with the adoption of Section 14.45 was the wording in the first part, viz.: "No policy or contract of liability insurance shall be *issued* or *delivered* in this State, unless it contains provisions * * *." (Emphasis supplied.)

11. The policy was issued and delivered in Texas and purportedly insured primarily against liability arising out of the operation of defendant's vehicles usually kept and operated in that state. However, the accident occurred in Caddo Parish in Louisiana.

12. This policy was issued, and apparently delivered, in the District of Columbia. The "no action" clause prevented recovery from the insurer until judgment had been obtained against the tortfeasor, which would have been a practical impossibility here because the insured was a member of the armed forces moving from place to place with no permanent residence, although the insurer was doing business in Louisiana. The court pointed out the legislature adopted Act 155 of

the federal court sitting in the Eastern District of Louisiana held in Belanger v. Great American Indemnity Co., D.C., 89 F.Supp. 736, that the legislature by its incorporation of the 1918 act as amended in 1930 in the Insurance Code of 1948 as Section 14.45 intended to specifically limit "its application to policies *issued* in Louisiana." [13] (The emphasis has been supplied.)

This decision was handed down in April of 1950 and the legislature, meeting the next month, adopted its Senate Concurrent Resolution No. 13 in which it recognized this

prior jurisprudence and declared in no uncertain terms that "It was never the intention of the Louisiana Legislature in enacting Act 195 of 1948 and particularly Section 14.45 *to repeal, amend, limit or in any wise restrict the application of Act 253 of 1918 as amended by Act 55 of 1930 in so far as that Act provides a direct action against liability insurers on behalf of the injured person or his or her heirs."* At the same session of the legislature it sought to overcome such an interpretation through the adoption of Act 541,[14] which amended

---

1930 "to protect its citizens against such difficulties."

13. The policy is this case was issued in Massachusetts.

14. Section 14.45 of the Insurance Code (now R.S. 22:655) as it appears today through its amendment in 1962 is as follows: "No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer

jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. *This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana.* Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State. It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and

Section 14.45 by merely adding (without further change) the following sentence which is italicized in this section as it appears in Footnote No. 14: "This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana."

And when it became aware some courts were, in perfunctory conclusions, holding

that by the 1950 amendment the legislature meant to render the right of direct action unavailable to the injured person when the accident occurred in a foreign state,[15] which was not only contrary to the legislative intent in including this sentence in Section 14.45 of the code (now R.S. 22:655), but also contrary to former jurisprudence (Hudson v. Georgia Casualty Co., 5 Cir., 57 F.2d 757, decided in 1932, shortly after the adoption of Act 55 of 1930),[16] the legislature in 1962 attempted to further amend this section through its adoption of House

that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tortfeasor within the terms and limits of said policy." The italicized sentence reflects the only change made by Act 541 of 1950.

15. The federal courts were the first to interpret this 1950 amendment in Weingartner v. Fidelity Mut. Ins. Co. of Indianapolis, 5 Cir., 205 F.2d 833, and Hidalgo v. Fidelity & Casualty Co. of N. Y., 5 Cir., 205 F.2d 834, both decided in 1953, with the mere statement that by adopting Act 541 of 1950 the legislature intended "to limit the application of the statute to accidents or injuries that occurred in Louisiana." And, despite an excellent concurring opinion by Judge Rives in the Weingartner case showing the legislative history of the amendment evidence a contrary intent, the lower appellate courts of this state, just as perfunctorily, disposed of the 1950 amendment. Honeycutt v. Indiana Lumbermen's Mutual Ins. Co., La.App., 130 So. 2d 770; Nicholson v. Atlas Assurance Corp., La.App., 156 So.2d 245; and Kay

v. Lumbermen's Mutual Ins. Co., La. App., 158 So.2d 422.

16. This decision was written by Judge Ben C. Dawkins of the Western District of Louisiana, formerly a Justice of the Louisiana Supreme Court, his conclusion being that the right of direct action was available to the injured person even though the accident occurred in Arkansas. In reaching this conclusion he reasoned, in part: "The contract of insurance was made in this state and established a contractual relation between the insured and the insurer, from which certain statutory rights flowed in favor of third persons who might be injured, the first (Act No. 253 of 1918) giving to them the privilege of suing the insurer in the event of the bankruptcy of the insured, and, the second (Act No. 55 of 1930), permitting the bringing of the action direct against the former in the first instance. I cannot see that, because the circumstances supporting the exercise of that right happened out of the state, this would force a citizen of this state to go into a foreign jurisdiction for the purpose of asserting it. The object of the state law was to protect its own citizens and to afford them an opportunity in local tribunals of testing such claims in cases growing out of business done here."

Bill No. 935 by deleting from the sentence added in 1950 the final clause, viz.: "provided the accident or injury occurred within the State of Louisiana," only to have this statute vetoed by the Governor.[17]

In the light of the foregoing background it would seem ridiculous to hold that the legislature intended by the incorporation of this sentence in R.S. 22:655 under the 1950 amendment to deny the right of direct action to an injured resident of this state merely because the accident occurred outside of Louisiana when the policy was secured in this state; from an agent of the insurer that was doing business in this state; was secured by an insured domiciled in this state; was issued for the specific purpose of protecting the public generally, including the plaintiffs, who are Louisiana residents, and who brought their suits at the domicile of the insured,[18] one of the two jurisdictions having venue under Act 55 of 1930.[19]

17. This veto was clearly not grounded in an intention to overrule this legislative expression of intent with respect to the 1950 amendment, but, apparently, because of the conflict that would result from the venue provisions of House Bill No. 935 and Act 471, adopted at the same session, wherein an injured person was given greatly enlarged rights with respect to the jurisdiction in which the suit could be brought, i. e., all of those jurisdictions provided for in the general rules of venue prescribed by Article 42 of the recently adopted Code of Civil Procedure, in addition to the parish where the accident or injury occurred.

Act 541 of 1950 was adopted to make it clear that the holding in the Belanger case with respect to the legislative intent in adopting Section 14.45 of 1948 was not only contrary to the jurisprudence of this state, but also erroneous and contrary to the legislative intent. While it may be said that Section 14.45 as incorporated in the Insurance Code under the 1950 amendment (now R.S. 22:655) was inartistically drawn and ambiguous when considered in the light of other provisions of R.S. 22:655, which were left unchanged, as pointed out above, the intent of the legislature is clearly demonstrated in its concurrent resolution adopted at this same session. The legislature never intended by its adoption of Act 541 of 1950 to limit R.S. 22:655 to accidents occurring in the state. Its intention, instead, was to simply provide that when the accident or injury does occur within Louisiana, the direct action right exists "whether the policy of insurance sued upon was

18. With such overwhelming "contacts" and this significant relationship in Louisiana, a holding to the contrary would conflict with our decisions with respect to "minimum contact" in this state. Morrison v. New Hampshire Ins. Co., 249 La. 546, 187 So.2d 729. Furthermore, this Louisiana issued policy covers all accidents in the United States, Canada, and Mexico, except for Alaska and Hawaii, and Zurich is obligated to defend the insured no matter where sued, and to pay any judgment secured. The plaintiffs have secured such a judgment in Louisiana.

19. Although the venue provisions were greatly enlarged under Act 471 of 1962 (see Footnote No. 17), these suits were instituted in 1957.

written or delivered in the state of Louisiana or not and whether or not such policy contains a provision forbidding such a direct action."

Since this opinion was written, supplemental briefs were filed by the plaintiffs and also by Zurich, including one on behalf of Mrs. Webb calling our attention to a recent decision of the federal court for the Eastern District of Louisiana, in the case of Jonie B. Taylor v. Fishing Tools, Inc., as yet unreported, 274 F.Supp. 666, in which the court, in a well considered opinion, reached the same conclusion we have with respect to the legislative intent in adopting the 1950 amendment.

In reply, counsel for Zurich attack this decision, contending it is not only contrary to the holding of other federal courts on the subject, but also to decisions of the lower appellate courts of the state.[20] Counsel also call our attention to the fact that the Governor vetoed the bill adopted by the legislature in 1962 providing for the deletion of that portion of the 1950 amendment that had proved troublesome ("provided the accident or injury occurred within the State of Louisiana"), and, for this reason, the courts are without authority to override the veto of the Governor to effect a judicial amendment of the statute.

■ While the decisions of the courts of other jurisdictions, as well as those of our lower appellate courts, may be persuasive, they are not controlling. Moreover, as pointed out above in Footnote No. 15, these decisions were perfunctorily written without consideration of the legislative history of the 1950 amendments. Actually, they are not authority for the position Zurich takes here.

In the first of our appellate court decisions relied on by the insurance company, Honeycutt v. Indiana Lumbermens Mutual Ins. Co., 130 So.2d 770, the suit against the insurer was dismissed in reliance on the holding in Blount v. Blount, LaApp., 125 So. 2d 66, but the issue was never presented to the appellate court in Blount v. Blount because the plaintiffs did not appeal from the judgment dismissing the insurer under R.S. 22:655 as amended in 1950, but only from a decision on the merits, which was based on the law of Texas, where the accident occurred. The appellate court made no pronouncement with respect to the 1950 amendment.

The statement in Nicholson v. Atlas Assurance Corporation, La.App., 156 So.2d 245, to the effect that the direct action statute did not apply because the accident occurred in Mississippi is nothing more than dicta, for the decision rested on the conclusion that under the substantive law of Mississippi a wife could not sue her husband for torts committed during coverture, and

20. These decisions are set out above in Footnote No. 15.

she would fare no better under the substantive law of Louisiana, which also prevented her, during marriage, from suing her husband for damages growing out of tort.

Neither was the question presented to the appellate court in Kay v. Lumbermen's Mutual Casualty Co. et al., La.App., 158 So.2d 422, for after the insurers in that case sought its dismissal as to them under the 1950 amendment to R.S. 22:655, the plaintiff himself dismissed the action and this question was not raised on appeal.

Thus it may be seen that the authorities relied on by counsel have little if any probative effect. To say the least, they are not persuasive.

The fact that the Governor vetoed the act of the 1962 legislature which sought to eliminate from the sentence added in 1950 the clause "provided the accident or injury occurred within the State of Louisiana" to avoid the interpretation being erroneously placed on this portion of the sentence, does not detract from the provisions of the statute as they were previous to this 1962 legislative action. The conclusion we have reached in this case does not constitute, as asserted by defense counsel, an attempt to judicially amend the statute despite the Governor's veto, but, instead, is only our interpretation of the 1950 amendment to reflect the real intent of the legislature in adopting it.

The argument that Zurich's public liability coverage cannot be considered as supplemental to the bond of the sheriff and deputy sheriff is untenable in view of the purpose for which the Sheriff secured this policy and the coverage contracted for under the very provisions of the policy itself. This is clearly evidenced by the fact that if the liability coverage contracted for was not intended to supplement the amount of the official bonds, and did not, in fact, do so, then there would have been no purpose for obtaining more than property damage coverage, and certainly not liability coverage extending to all passengers, including prisoners, in the amount of $500,000 for a single accident, which far exceeded the bonds of the sheriff and deputy sheriff, $6,000 and $5,000 respectively, R.S. 33:1443 and 1433.

■ Furthermore, under the jurisprudence any limitation on the right of the plaintiffs as against the Sheriff with respect to the amount of his bond would be one personal to the Sheriff, which could avail the insurer nothing. See, Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191; Ruiz v. Clancy, 182 La. 935, 162 So. 734; Rome v. London & Lancashire Indemnity Co., La.App., 169 So. 132; Musmeci v. American Automobile Ins. Co., La.App., 146 So.2d 496; Tucker v. Marquette Casualty Co., La.App., 138 So.2d 25.

With respect to the policy provisions themselves, in the "Declarations" it is stipulated that the named insured is the "East Baton Rouge Parish-Sheriff's Office," but in the insuring agreements it is stipulated that "The unqualified word 'insured' wherever used *includes not only the named Insured but also any person while using the aircraft and any person* * * * *legally responsible for. its use,* provided the actual use is with the express permission of the named Insured," with certain exceptions that are not applicable here.[21] (The emphasis has been supplied.)

■ Under Section 5D of the "Declarations," Zurich's liability coverage is stipulated to be "Single limit—including *passengers* * * * *$500,000,*" and, in the insuring agreements, passengers are defined as "any person or persons while in, entering or leaving the aircraft," except pilots, crew, and employees of the insured while acting in the course of their employment.[22] From this it is obvious that such employees, if not acting in the course and scope of their employment, would be considered as passengers. (The emphasis has been supplied.)

The insuring agreements further stipulate, in so far as pertinent here, that Cov-

erage D, entitled "Single-Limit—Bodily Injury *(Including Passengers),*" obligates the insurer *"To pay on behalf of the Insured all sums which the Insured shall become obligated to pay* * * * *for damages* * * *including death* * * * *sustained by any person or persons* * * * *arising out of the* * * * *use of the aircraft."* The only exclusions in the case of passengers is provided for in a special rider, and is limited to "claims resulting from injuries caused to prisoners because of action necessitated to subdue them." Furthermore, in Section 7 of the "Declarations" it is stipulated that the uses to which a plane may be put and still come under the coverage are for "Pleasure and Business of the Sheriff"s Office," and under Section (g) of "Conditions," "Pleasure and business" is defined as "personal, pleasure, family and business uses." The only uses excluded are those "for which a charge is made." (The emphasis has been supplied.)

■ It is true the policy was issued conditioned upon the fact that "No action shall lie against the Company under Coverages * * * D * * * unless the amount of the insured's obligation to pay shall have been finally determined * * * by judgment against the Insured after ac-

---

21. These exclusions are: a named insured, employees of an insured injured in the course of employment when plane is being used in business of insured; employees of manufacturers of plane, accessories; airports, flying schools, etc., arising out of the operation thereof; and student and renter pilots.

22. It is because the pilot, Pittman, was acting within the scope of his duties that he is prevented from recovering under this provision.

tual trial," and the further stipulation that "nothing contained in this Policy shall give any person * * * any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability." However, realizing such stipulations would be without legal effect if contrary to Louisiana law, as such laws are considered as written into the policy, there is contained the further stipulation that *"The terms of this Policy which are in conflict with the statutes of the state wherein this Policy is issued are hereby amended to conform to such statutes."* (The emphasis has been supplied.)

■ The appellate court, as did the district court, found the accident in this case was caused by the negligence of Pittman. Our appreciation of the record is that they were correct in this conclusion. As ably and succinctly pointed out by the appellate court: "The record in this case contains testimony and depositions from persons who saw the crash; from the tower personnel at Fort Wayne, Indiana, and Lansing, Michigan; from the man who conducted the official investigation of the crash; from expert meteorologists; and from experts in the field of aircraft accidents. In all this voluminous record there is hardly a word of testimony that does not point to the conclusion that was reached by the trial court: that the accident was caused by the negligence of Paul O. Pittman, the pilot of the plane,

in flying the plane under conditions which were beyond his capabilities and experience as a pilot."

■ However, in reversing the judgment of the district court, the appellate court concluded that Pittman made the flight not because he was a deputy sheriff under the orders of the sheriff, but because the plane was on loan to the Mayor-President, who asked Pittman to make the flight; consequently, that the Sheriff was not liable.

In this we cannot agree. The evidence unmistakably shows that no one was authorized to use the plane without the Sheriff's specific consent and authorization, and that on the occasion of this trip, after ascertaining Pittman's availability to make the flight, the Sheriff entrusted the plane to him as the one designated in the policy to pilot it and instructed him to make the trip, leaving only the details of the flight to be worked out by Pittman with Webb. Clearly under these circumstances the aircraft was under the absolute control of the pilot for the duration of the entire trip as the agent of the Sheriff.

■ We now pass to the next contention urged by Zurich, i. e., that this particular flight was not covered by the policy because it specifically excluded the use of the aircraft "While with the knowledge and consent of an Insured * * * (b) the aircraft * * * is (was) be-

ing operated in violation of the current applicable Civil Air Regulations for the flight involved * * *." The basis for this contention is that Pittman, "an insured" under the policy, and holding a private license for *visual flying* only, was knowingly flying the plane *on instruments* at the time of the accident, *in violation of these federal regulations.*

· We agree with the conclusion of the trial judge that this was a special defense that Zurich had the burden of establishing, and that he properly concluded Zurich failed to carry this burden.

As pointed out by the trial judge in his written reasons for judgment, upon the initiation of the flight there is no doubt that Pittman was flying under a visual flight plan, and at the time he last contacted the Lansing, Michigan, airport control tower he was flying under visual flight rules at 1,000 feet above the clouds. The plane was not seen or heard from again until several witnesses on the ground immediately prior to its crash saw it plummeting to the ground in what is termed a "graveyard spiral."

Under these circumstances, we think the language of the court in Tison v. Fidelity and Casualty Co. of N. Y., La.App., 181 So.2d 835, where, for all intents and purposes the facts are similar, is particularly applicable to the issue in this case: "The fallacy of appellant's [relator's here] argu-

ment is that no one knows what occurred to cause the aircraft to get beyond the control of the pilot. There is no evidence in the record to indicate the pilot voluntarily descended into the cloud layer prior to the crash nor is there anything to indicate that he attempted instrument flying. The *burden of proof* rests upon appellant *to show that the violation of the regulation concerning instrument flying* did occur. This it has not shown to our satisfaction." We might add that at best the evidence in the record which Zurich asserts supports its contention under this special defense is nothing more than speculative. (The emphasis and material within brackets has been added.)

For the same reasons we think the contention of counsel for Zurich that there was a further violation of the Civil Air Regulations in that plaintiffs failed to identify the pilot of the plane as Pittman, the only one with a license to fly, is without merit. Contrary to the asserted fact on which this contention is primarily predicated, i. e., that the official reports disclose Webb's body was found in the pilot's seat after the crash, the official report forming a part of Joint Offering No. 1 in the record, which lists Webb as occupying the left front (pilot) seat, this same report stipulates directly thereunder: *"Seating arrangements not known.* Undertaker, who removed bodies, said it *appeared* as stated above." There is a further notation

on this report to the effect that "All occupants undoubtedly died before fire. Burned beyond recognition. *Identification by means of remains of wallet contents."* And a state trooper who helped remove the bodies from the plane testified that Pittman, who was identified from his wallet, was in the pilot's position in the plane. (The emphasis has been supplied.)

We therefore conclude that Zurich is liable under the express provisions of its policy for the deaths of Mayor-President Jesse L. Webb, Jr., and Dr. James Kimbrough Owen.

■ We have reviewed the record in order that we might determine whether Mrs. Webb's claim for an increase in the amount awarded her and her minor children is warranted, and we find nothing therein to disclose that the trial judge abused his discretion in fixing these damages in the amount awarded, which we find to be fair and reasonable.

For the reasons assigned, the judgment of the Court of Appeals for the First Circuit and the judgment of the district court dismissing the plaintiff's suit against the Zurich Insurance Company is reversed; the exceptions of no cause and no right of action filed by the company are overruled; and it is now ordered, adjudged, and decreed that there be judgment against the Zurich Insurance Company and in favor of Mrs. Mary Estus Webb individually and in her representative capacity in the amount of $234,412.11, apportioned $164,412.11 to her individually, and $17,500 each to her four minor children, Jesse Lynn Webb, III, Leah Catherine Webb, Charlotte Ann Webb, and James Clifton Webb, with legal interest from judicial demand until paid. All costs are to be paid by the Zurich Insurance Company.

HAMITER, J., concurs in the result.

McCALEB, J., dissents being in accord with the views of the Court of Appeal. See La.App., 194 So.2d 441.

HAMLIN, J., dissents being of the opinion that the result reached by the Court of Appeal is correct.