575 So.2d 336 (1990)
Bill QUINLAN, Pat Quinlan, Lennard Lapuyade, Johanna Lapuyade, Fabio J. Canton on Behalf of and/or Michael McCullar, F. King McGoey, Karen McGoey, Justin J.W. Hendricks and Matthew F. Rice, Jr. on Behalf of his minor son, Bryan M. Rice,
v.
LIBERTY BANK AND TRUST COMPANY and the St. Paul Insurance Company, Houston, Texas.
No. 89-C-1644.
Supreme Court of Louisiana.
March 12, 1990.
Rehearing Granted September 13, 1990.
On Rehearing March 11, 1991.
*337 William W. Miles, Lemann, O'Hara & Miles, New Orleans, for all plaintiff-applicants.
Harvey C. Koch, Gary J. Rouse, Mishthi G. Ratnesar, Koch & Rouse, New Orleans, for St. Paul Fire & Marine Ins. Co., defendant-respondent.
Stephen G. Bullock and Cecilia C. Woodley, New Orleans, amicus curiae.
*338 WATSON, Justice.
The issue is whether plaintiffs have a right of direct action against defendant, St. Paul Insurance Company, under the Louisiana Direct Action Statute[1] in connection with a "Directors' and Officers' Liability Policy"[2] issued by St. Paul to Liberty Bank and Trust Company.

FACTS
Plaintiffs filed suit alleging that the bank and its directors and officers' liability insurer were liable for negligent management of their funds by an officer of the bank, Rehm Winters. St. Paul filed an exception of no right of action on the ground that its policy was an indemnity policy which is not subject to the Louisiana Direct Action Statute.
The trial court sustained the exception of no right of action and dismissed plaintiffs' direct action against St. Paul. The court of appeal affirmed on the ground that the policy is one of indemnity, excluded from the scope of the direct action statute.[3] A writ was granted to consider the judgment of the court of appeal.[4]
The bank's directors' and officers' liability policy provides two types of coverage: "A. Corporate Indemnification;" and "B. Directors' and Officers' Liability." Under Section B, St. Paul agrees to pay on behalf of the insured bank any claims against its directors and officers for loss "caused by any negligent act, any error, any omission or any breach of duty while acting in their capacities as Directors or Officers or any matter claimed against them solely by reason of their being Directors or Officers."[5]
As its caption indicates, this insurance policy is a policy of liability insurance.[6] *339 Liability insurance is any insurance protection which indemnifies liability to third persons. Black's Law Dictionary 824 (5th ed. 1979). In Louisiana, liability insurance, including that which purports to be indemnity, must protect the public as well as the insured. Olympic Towing Corporation v. Nebel Towing Company, 419 F.2d 230 (5th Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). All liability insurance comes within the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.
The court of appeal erred in sustaining the exception of no right of action on behalf of St. Paul. For the foregoing reasons, the judgment of the court of appeal is reversed and the matter is remanded for further proceedings.
REVERSED AND REMANDED.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., dissents for reasons assigned by COLE, J.
COLE, J., dissents and assigns reasons.
COLE, Justice, dissenting.
I respectfully dissent.
The issue before this court is whether the Directors and Officers Insurance Policy issued by St. Paul to Liberty Bank is a liability policy or an indemnification policy. Plaintiffs filed a lawsuit against Liberty Bank and Trust Company, Rehm Winters, an officer of Liberty, and St. Paul Insurance Company, the insurer of the officers and directors of Liberty, alleging that Winters negligently breached his fiduciary duty to them under a limited partnership agreement pursuant to which Winters, as the general partner, was to invest funds deposited by plaintiffs, the limited partners.[1] Plaintiffs assert a direct right of action against St. Paul under La.R.S. 22:655 which provides for a direct right of action by a third party against an insurance company where the policy sued upon is a liability policy.[2]
St. Paul filed the peremptory exception raising the objection of no right of action,[3] arguing plaintiffs could not sue St. Paul directly under Louisiana's Direct Action Statute because the statute covers only liability policies, and the policy sued upon is an indemnity policy. The trial court sustained the exception, and the court of appeal affirmed. 545 So.2d 1140 (La.App. 4th Cir.1989). We granted plaintiffs' application for a writ of review. 550 So.2d 637 (La. 1989). The policy at issue is clearly an indemnification policy and thus not covered by Louisiana's Direct Action Statute. Therefore, I dissent.

LAW
Plaintiffs argue the policy at issue is a liability policy, and alternatively, that the term "liability insurance" as it is used in the Direct Action Statute includes "indemnity" insurance. The latter argument is also advanced in the amicus brief. Liability and indemnity policies have been distinguished by this court as follows:
An indemnity agreement is a specialized form of contract which is distinguishable from a liability insurance policy. A cause of action under a liability insurance policy accrues when the liability attaches. Appleman, Insurance Law and Practice (Buckley ed.) § 4261. However, an insurer's duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy. (citations omitted). On the other hand, an indemnity agreement *340 does not render the indemnitor liable until the indemnitee actually makes payment or sustains loss. BLACK'S LAW DICTIONARY 692-93 (5th ed. 1979); Appleman, Insurance Law and Practice (Buckley ed.) §§ 4261, 6668.
Meloy v. Conoco, Inc., 504 So.2d 833, 839 (La. 1987).
In Arrow Trucking Co. v. Continental Ins. Co., 465 So.2d 691 (La. 1985), we declined to allow a direct action by an insured against its insurer's reinsurer where the reinsurance agreement was in the nature of indemnity rather than liability. We stated in Arrow, "The Direct Action Statute, La.R.S. 22:655, applies only to `polic[ies] or contract[s] of liability insurance.'" Id. at 700. Plaintiffs' argument that the definition of liability insurance, as used in the Direct Action Statute, may be construed to include indemnity insurance is without merit.
The history of the Direct Action Statute, as well as the difference between the terms of general liability policies and Directors' and Officers' (D & O) liability policies, provide ample support for distinguishing between the two. In 1918, the Louisiana legislature passed the first act which eventually led to the present version of La.R.S. 22:655, the Direct Action Statute.[4] Prior to the passage of this act, insurance policies typically provided only for indemnification of the insured for loss actually sustained. Coverage under such policies was not triggered until the insured tortfeasor had suffered an actual loss through payment of a judgment to the victim. If the insured failed to make payment on the judgment due to insolvency or bankruptcy, he suffered no actual loss and no amount was collectible by the victim from the insurer.[5]
In enacting the Direct Action Statute, "[t]here is little doubt that the legislators were thinking of ordinary tort-induced injuries resulting from automobile accidents,"[6] where victims were left uncompensated, and insured tortfeasors without the means to pay a judgment received no benefit in exchange for premiums paid to insurers. See Webb v. Zurich Insurance Co., 251 La. 558, 205 So.2d 398 (1967).
The public policy behind the Direct Action Statute was made clear when it was amended in 1956 to provide:
It is also the intent of this Section that all liability policies ... are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, ... for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy.
Added by Act 475 of 1956, § 1. The policy of protecting automobile accident victims from insolvent tortfeasors is further evidenced by the requirement that every motor vehicle (with the exception of a few) be covered by an automobile liability policy.[7]
Although there is certainly a need to protect investors from the negligence or misconduct of corporate officers and directors, the public policy behind indemnification of officers and directors is that "people who serve in these positions should, in the absence of certain conduct (fraud, breach of fiduciary duties, etc.) be free from personal liability for corporate acts." J. Bishop, "The Law of Corporate Officers and Directors: Indemnification and Insurance," (1981, cum. supp. 1989), ch. 6, p. 8, § 6.02[1]. See also 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 232 (La. 1989), in *341 which we recognized this policy. This public policy is fueled by the need to induce competent people to serve as corporate officers and directors. Since indemnification by the corporation is often discretionary,[8] "[l]arge corporations ... need ... [insurance] protection, in order to attract and retain directors of substance and prominence." W. Knepper, "Liability of Corporate Officers and Directors," 4th ed. at 749. D & O insurance comports with public policy by protecting officers and directors not only from personal liability, but from the costs incurred in defending lawsuits against them. Evidently, the protection at which D & O policies are aimed differs substantially from the protection at which other types of liability insurance are aimed. Also, unlike automobile liability insurance and other types of insurance which provide coverage for physical injury or damage to property, D & O insurance has only recently become prevalent. Although a form of D & O coverage purportedly has been available through underwriters at Lloyd's since the 1940's,[9] it was not until the 1960's that the first policies appeared on the American market.[10]
The Direct Action Statute stemmed from a need to protect the public from insolvent tortfeasors and abuses by insurance companies. Because corporations which carry D & O insurance are generally wealthy,[11] there is no compelling need to protect the public, particularly investors, from the insolvency of such corporations in the event a judgment against an officer or director is obtained. Indeed, there is no requirement that corporations carry D & O insurance.[12] Those corporations which do carry D & O insurance do so for the benefit of the corporation (in instances where indemnification of its officers and directors is mandatory) and its officers and directors (in instances where the corporation either cannot or chooses not to indemnify them). Investors benefit only incidentally, since the availability of insurance proceeds preserves the value of the corporation to its stockholders and investors by obviating depletion of corporation assets through defense and payment of a judgment. This benefit to investors is, however, appropriate justification for allowing corporations to undermine, through insurance protection, the deterrent purposes of the liability imposed upon their officers and directors by law.
Traditional D & O insurance provides two distinct coverages. The first coverage (Coverage 1A under the St. Paul policy), referred to as corporate reimbursement or indemnification, provides for reimbursement of the corporation for amounts which it is lawfully permitted or required to expend in indemnifying its officers and directors. The second coverage (Coverage 1B under the St. Paul policy), referred to as the personal, direct, or D & O coverage, provides for reimbursement of the individual directors and officers for losses for which they are not indemnified by their corporation. D & O policies do not insure the liabilities or defense costs of the corporation itself. A corporation's comprehensive general liability policy provides coverage for its "individual" corporate liability. See Knepper, supra, at 687, § 21.02. See also Continental Casualty v. Board of Educ., 302 Md. 516, 489 A.2d 536, 543 (1985).
*342 Under liability policies, a duty to defend is imposed upon the insurer. In keeping with the policy of protecting injured persons, defense costs in a liability policy are treated as being outside of the liability limits. Thus the entirety of the policy limit will be available for payment of a judgment against the insured. D & O policies, on the other hand, include defense costs in the policy limits. The possibility of incurring defense costs, and the magnitude of those costs tend to be much greater for corporations and their officers and directors than for individuals. Thus a corporation's vulnerability to litigation is a factor in negotiating D & O insurance contracts,[13] which include defense costs in the definition of "loss," which is subject to the policy limits. If a duty to defend were judicially or legislatively imposed on all D & O insurers, whereby defense costs were considered outside the policy limits, it is conceivable that this type of insurance would become either unavailable or so expensive that it would be unaffordable.[14]
Although "D & O insurance policies are labelled `liability' policies[15] [they] were originally designed and have always been intended to be `indemnity' or reimbursement policies. They are not liability policies in the sense that term is ordinarily used." Knepper, supra, at 702 § 21.08. In Zaborac, supra, note 14, a declaratory judgment action seeking resolution of the rights and liabilities of the parties under a bank D & O liability policy, the court stated:
The directors and officers liability insurance policy in the present case requires only that the insurer indemnify its insured for losses incurred, with the definition of loss including defense costs. This makes it different from a general liability policy, in which the insurer must defend an insured in addition to indemnifying him against liability.
* * * * * *
... Furthermore, the insurance company's obligations do not accrue until the loss suffered by the insured can be ultimately determined, which is at the time the underlying claims are adjudicated or settled.
Zaborac, supra, at 332. Absence of a "duty to defend" was used as a factor in distinguishing between a general liability policy and a D & O liability policy in Continental Casualty, supra. The court stated:
Provisions of the subject CNA policy relating to defense are substantially different from the duty to defend clause of a conventional liability policy. Assureds and/or the Board, not CNA, select and retain defense counsel. "Loss," whether incurred by way of judgment, settlement, or defense costs, is charged against the policy limit without distinguishing between damages and legal fees.
Id. 489 A.2d at 543. See also Knepper, supra, at § 21.08 pp. 702-03, where Zaborac *343 and Continental Casualty are discussed and cited in support of the contention that D & O policies are indemnity policies, and are different from liability policies.

ANALYSIS
The St. Paul policy expressly disavows any obligation on the part of the insurer to provide a defense to a claim or suit,[16] and treats defense costs as a component of the insured's loss which falls within the limits of coverage.[17] The policy also provides: "The Insured shall not be required to contest any legal proceedings unless Counsel (to be mutually agreed upon by the Insured and the Company) shall advise that such claim should be contested by the Insured, and the Insured has consented thereto such consent not to be unreasonably withheld...." Since the policy limit will be reduced by the costs of defense, the insured is given control of the amount of money expended in the defense of lawsuits.[18]
The "Loss Payable" clause provides further evidence that the St. Paul policy is an indemnity rather than a liability policy. It provides:

Recovery under this contract in respect to claim or loss arising out of any occurrences covered hereunder shall not be made unless and until the Insured's liability has either been rendered fixed and certain by final judgment or admitted by the Company in writing; but in no event shall recovery be made hereunder unless proof of claim is made upon the Company within ninety (90) days after final judgment or admission. (emphasis added.)
St. Paul argues this provision, which establishes that the insured's liability must be fixed and certain before the insured can recover under the contract, is consistent with the definition of an indemnification contract. I agree. See discussion of Zaborac, supra. In addition, unlike a liability policy, this policy permits recovery where proof of claim is made upon the company within ninety days after the final judgment or admission.
The "Loss Payable" clause further provides:
It is not the intention of this Policy that it shall operate as or be construed to be additional insurance. The Company shall not be required to pay any portion of its coverage unless and until the Insured has actually and in fact paid to the claimant or claimants the full limit of its retention. Proof of payment *344 by the Insured of its full liability shall be a condition precedent to any and all liability and claim against the Company under this contract. (emphasis added.)
Plaintiffs argue the term "full liability" as it is used in the last sentence of the paragraph, means the insured's "retention" (commonly called a deductible) since the retention represents the limit of the insured's "full liability," or, the amount for which the insured will not be reimbursed. Under plaintiffs' interpretation, the insured would have to pay only its retention before making a claim against the company.
Since the language of the contract is ambiguous on this point, it must be construed in favor of the insured. Nonetheless, the insured must make some payment, and suffer some loss before it can recover from the insurer. This requirement is sufficient to bring the policy into compliance with the traditional definition of indemnity insurance, whereby the indemnitee must actually make a payment or sustain loss before he may collect from the indemnitor. See Ahmed v. Am. S.S. Mut. Protection & Indem. Ass'n., 640 F.2d 993 (9th Cir.1981). The amount of the payment or loss need not be the full amount for which the insured is adjudged liable.[19]
Since D & O insurance policies are not always in accord with the principles of strict indemnity,[20] the policy need not require payment of some sort by the insured in order to avoid classification as a liability policy. Although the principles of indemnity dictate that the insured must suffer a loss, in the context of D & O insurance, "[s]uch a loss may be incurred when an obligation to pay becomes fixed, even though the money has not actually been paid." Knepper, supra, at 703-04.[21]

MAJORITY OPINION
In support of its decision, the majority cites two cases, both decided by federal courts, and Black's Law Dictionary. The authorities cited provide little guidance, and they certainly are not controlling. Neither of the two cases cited indicates or suggests characteristics which distinguish a liability policy from an indemnity policy and Black's definitive thrust supports this dissent.
Olympic Towing Corporation v. Nebel Towing Company, 419 F.2d 230 (5th Cir. 1969) involves a policy of marine insurance covering damage to the ship's cargo, rather than directors' and officers' insurance. As pointed out earlier in this dissent, D & O insurance differs substantially from other types of insurance which provide coverage for physical injury or damage to property, and it was with the latter in mind that the legislature enacted the Direct Action Statute.
In Olympic Towing, the court found the shipowner's Protection and Indemnity Policy was a liability policy despite its no-action clause, which is typically found in indemnity policies, and its "indemnity" label. This finding was proper since the Direct Action *345 Statute was enacted to prevent abuses and injustices engendered by no-action clauses. The Olympic Towing court also noted a policy provision which gave the insurer the option of providing a defense at its cost and expense, and under its exclusive control. Id. at 236, n. 22. While this provision is not the equivalent of a duty to defend, the provision of a defense by the insurer at its expense, and over which it exercises exclusive control, is more consistent with the terms of a liability policy than those of an indemnity policy. Under an indemnity policy, the insurer does not pay defense costs because they are included in the policy limits. The same is not true of a liability policy. Thus, any provision under which the insurer provides a defense at its expense should be viewed as an indication that the policy is one of liability. Therefore, the conclusion in Olympic Towing that the policy is a liability, rather than an indemnity policy, is not at odds with this analysis. Nor, however, does it support the majority's holding.
The Olympic Towing court merely discussed the no-action clause, noting it was ineffective under Louisiana law and violative of this state's public policy regarding liability insurance.[22] As already pointed out, the availability of D & O insurance stems from the public policy of protecting corporate officers and directors from personal liability for corporate acts, and is not premised on protection of the public. Since the St. Paul policy contains a no-action clause, the majority apparently feels it is indistinguishable from the marine insurance policy at issue in Olympic Towing. I submit the policies are distinguishable by reference to the object of the insurance (the liability insured against), as well as the two policies' terms, which are typically different, particularly the terms relative to defense of covered acts.
At note 6, the majority cites Fidelity National Bank v. Aetna Casualty and Surety Co., 584 F.Supp. 1039 (M.D.La. 1984), in support of its position that the St. Paul policy is a liability policy, as its caption indicates. Other than a brief reference to the Coverage section of the policy,[23] the caption is the only portion of the policy mentioned by the majority. Apparently, the majority finds the caption of the policy to be the most important and persuasive factor in determining whether the policy is, in substance, a liability or an indemnity policy. The majority has placed form over substance, as Knepper, supra, illustrates: "D & O insurance policies are labelled `liability' policies but were originally designed and have always been intended to be `indemnity' or reimbursement policies." Id. at 702 sec. 21.08. See also note 15, supra. Even the Olympic Towing court disregarded its policy's heading. After analyzing the substance of the policy before it, the court concluded it was a liability policy, despite its "Protection and Indemnity Policy" heading.
Although Fidelity National Bank involved a D & O liability policy, that decision did not reveal or discuss the terms of the policy at issue. The language quoted by the majority in note 6 comprises the entirety of the federal court's discussion of whether the D & O policy was a liability policy within the scope of the Direct Action Statute. The difference between indemnity and liability insurance was not discussed. Consequently, Fidelity National Bank *346 does not provide persuasive authority or guidance on the issue of whether the St. Paul policy is a liability or an indemnity policy.
The majority cites Black's Law Dictionary to support its assertion: "Liability insurance is any insurance protection which indemnifies liability to third persons." The exact text referenced is: "That type of insurance protection which indemnifies one from liability to third persons as contrasted with insurance coverage for losses sustained by the insured. See also Insurance." (emphasis added.) Under "Insurance," Black explains "Liability Insurance" "is distinguished from `indemnity insurance' " which, in turn, is defined as "Insurance which provides indemnity against loss, in contrast to contracts which provide for indemnity against liability. The latter are known as liability contracts or policies, and the former as indemnity contracts or policies."
Finally, the majority fails to address the absence of a duty to defend in the St. Paul policy. A duty to defend is the hallmark of a liability policy. Thus, under a typical liability policy, the Direct Action Statute imposes no additional obligation on the insurer. To allow a direct action by plaintiffs against St. Paul is to impose upon St. Paul a duty to defend where, by the clear terms of the policy, none exists. As stated in note 20, some D & O policies provide the insurer with the option of advancing defense costs, provided if it is finally established the insurer has no liability under the policy, the insured will repay the insurer for such advances. In cases like this one, where the policy contains no such provision, the insurer may be forced to bear defense costs despite a lack of coverage, since an action against the insured for repayment will not be available under the policy. If taken to its extreme, the majority's conclusion that the St. Paul policy is a liability policy presents the possibility of defense costs exceeding policy limits, thereby exposing the insurer to greater liability than that which it obligated itself to pay.

CONCLUSION
The policy at issue is an indemnity policy, and not a liability policy, and therefore plaintiffs have no direct right of action under La.R.S. 22:655. The public policy announced in the Direct Action Statute would not be contravened by such a finding in this case. There is no need to allow a direct action by plaintiffs against St. Paul because the "no-action" clause of the policy provides:
No action shall lie against the Company, unless as a condition precedent thereto, the Insured shall have fully complied with the terms of this contract. In the event of the bankruptcy or insolvency of the Insured, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency. (emphasis added.)
Since the officers and directors of Liberty Bank are "Insureds" within the terms of the policy, and since Coverage 1B provides for reimbursement of officers and directors directly by the insurer where they are not indemnified by the corporation, any judgment obtained by plaintiffs for which there is coverage will be paid. Plaintiffs would stand to lose only the amount of the retention, since it would be deducted from the amount payable by St. Paul pursuant to a judgment for which there is coverage.
In the unlikely event a recalcitrant insurer refuses to pay covered claims for which an insolvent insured has been adjudged liable, plaintiffs, under the bankruptcy/insolvency portion of the "no-action" clause quoted above, could proceed against the insurer for collection of the judgment. An intent to allow plaintiffs this action can be inferred from the inclusion of the bankruptcy/insolvency provision in the "no-action" clause, which in essence, excepts from the no action prohibition the case of a bankrupt or insolvent insured.
For all of the foregoing reasons, I respectfully dissent.

ON REHEARING
DENNIS, Justice.
We granted a rehearing because the dialogue between the majority and dissenting *347 opinions on original hearing convinces us that the Direct Action Statute is not clear and unambiguous but requires further interpretation in search of the legislative intent, that each of our colleagues' opinions bears considerable persuasive force as to a different meaning attributable to the statute, and that resolution of the conflict in viewpoints will enable us to arrive at an interpretation that best conforms to the legislative aim and the purpose of the law. See La.Civ.Code arts. 9, 10 (1988).
The issue presented by this case is whether the Direct Action Statute, which in its literal terms applies to a policy or contract of liability insurance, requires that a tort victim who sustains only incorporeal property damage be allowed to bring a direct action against the tortfeasor's insurer.
In deciding this issue we derive enlightenment from both the majority and dissenting opinions and conclude that a synthesis of their interpretations best conforms to the purpose of the statute. After considering their opinions, the arguments of counsel, the extensive legislative history, jurisprudence and doctrine related to direct actions, we conclude that the statute applies to any insurance against the liability of the insured for the personal injury or corporeal property damage to a tort victim, regardless of whether the policy is framed in liability or indemnity terms, and, further, that the statute affords a person sustaining any other type of tortious loss or damage a direct action against the tortfeasor's insurer unless the insurance policy unambiguously expresses the parties' intent that it is a contract of indemnity against loss rather than a policy of insurance against liability.
Because the plaintiffs do not seek to recover damages for personal injury or corporeal property damage, their ability to bring a direct action depends on whether the policy is a liability or an indemnity contract. After examining the contract, we conclude that it is ambiguous and does not clearly express the parties' intent that it be a contract of indemnity against loss rather than a policy of insurance against liability. Consequently, we interpret the policy as one against liability, rather than as a mere contract of indemnity against loss, and decide that the Direct Action Statute applies in this case. Accordingly, the plaintiffs are entitled to sue the alleged tortfeasor's insurer directly.

BACKGROUND SUMMARY
In this action, the plaintiffs sued a bank and its insurer, the St. Paul Insurance Company, who issued a "directors' and officers' liability policy" insuring the bank and its directors and officers against any claims made against the directors or officers caused by any bank directors' or officers' negligent act, error, omission, or breach of duty while acting in their capacities as directors and officers. Plaintiffs alleged that they suffered damages when a bank officer, who was also plaintiffs' business partner, negligently co-mingled their funds with funds belonging to other investors, including other officers and directors of the bank, and contrary to a previous agreement invested the funds in the futures market on a margin basis. The trial court granted the insurance company's peremptory exception of no right of action finding that Louisiana's Direct Action Statute did not apply to plaintiffs' claims. The court of appeal affirmed concluding that the policy at issue was an "indemnity" policy and therefore outside the scope of the Direct Action Statute, which the court held only applied to policies or contracts of liability insurance. 545 So.2d 1140 (La.App. 4th Cir.1989). We granted plaintiffs' writ application. 550 So.2d 637 (La.1989).

THE DIRECT ACTION STATUTE
The Direct Action Statute, La.R.S. 22:655, at the time plaintiffs allege they suffered damage and at the time they filed suit, provided:
No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during *348 the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.
It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy.
La.R.S. 22:655.
The statute is open-textured; its expansive terms do not explicitly delineate its ambit. Terms such as "liability policy" or "injured person" may have more than one meaning in law and common usage; on their face they do not definitely inform us as to the kind of damages and insurance to which the statute applies. In order to properly interpret the statute with respect to the pertinent issues, it is necessary to consider the distinction between liability and indemnity contracts, the historical development of direct action statutes nationally and the legal and social environment out of which the Louisiana Direct Action Statute arose.

INDEMNITY AND LIABILITY INSURANCE DISTINGUISHED
In legal parlance "liability insurance" is used in both a broad and a narrow sense. When the term is used in a broad sense it includes both contracts of indemnity against loss and contracts of insurance against liability. See Vance, Insurance § 196 (3rd ed. 1951). But when the term is used in a narrow sense it refers only to contracts of insurance against liability as opposed to contracts of indemnity against loss. See Meloy v. Conoco, Inc., 504 So.2d 833 (La. 1987).
Under a liability policy (in the narrow sense) the insurer is required to make payment although the insured has not yet suffered any loss, for by definition the purpose of the liability policy is to shield the insured from being required to make any payment on the claim for which he is liable. Couch on Insurance 2d (Rev. ed.) § 44:4. Under an indemnity contract, by way of contrast, the insurer is only required to indemnify or make whole the insured after he has sustained actual loss, meaning after the insured has paid or been compelled to make a payment, his action against the insurer then being to recover the amount of such loss by way of indemnity. *349 Id.; See Meloy v. Conoco, Inc., 504 So.2d at 839.
The general distinction between the two kinds of insurance is that if the policy is one against liability, the coverage thereunder attaches when the liability attaches, regardless of actual loss at that time; but if the policy is one of indemnity only, an action against the insurer does not lie until an actual loss in the discharge of the liability is sustained by the insured. 43 Am. Jur.2d Insurance § 712 (1964); see also Meloy v. Conoco, Inc., supra; Waugh v. American Casualty Co., 190 Kan. 725, 378 P.2d 170 (1963); Gorman v. St. Paul Fire & Marine Ins. Co., 210 Md. 1, 121 A.2d 812 (1956); Kinnan v. Charles B. Hurst Co., 317 Ill. 251, 148 N.E. 12 (1925); McBride v. Aetna Life Ins. Co., 126 Ark. 528, 191 S.W. 5 (1917); Goodman v. Georgia Life Ins. Co., 189 Ala. 130, 66 So. 649 (1914); Frye v. Bath Gas & Electric Co., 97 Me. 241, 54 A. 395 (1903); Fenton v. Fidelity & Casualty Co., 36 Or. 283, 56 P. 1096 (1899); American Employers' Liability Ins. Co. v. Fordyce, 62 Ark. 562, 36 S.W. 1051 (1896); Anoka Lumber Co. v. Fidelity & Casualty Co., 63 Minn. 286, 65 N.W. 353 (1895); Couch, supra § 44:4; Appleman, Insurance Law and Practice (Buckley ed.) § 4261.
In general, the class into which a particular policy falls depends upon the intention of the parties to the contract, as evinced by the phraseology of the agreement in such respect in the policy. 43 Am.Jur.2d § 712; see also Michel v. American Fire & Casualty Co., 82 F.2d 583 (5th Cir.1936); Slavens v. Standard Accident Ins. Co., 27 F.2d 859 (9th Cir.1928); DaCosta v. General Guaranty Insurance Co. of Florida, 226 So.2d 104 (Fla.1969); Appleman, supra § 4261; 1 R. Long, Law of Liability Insurance § 1.06. If the policy is ambiguous, the ambiguity should be resolved by interpretation that the policy is one against liability rather than one of indemnity against loss actually paid by the insured. 43 Am.Jur.2d § 712; see also Michel v. American Fire & Casualty Co., supra; Lake v. Fidelity & Deposit Co. of Maryland, 430 F.2d 1251 (5th Cir.1970); DaCosta v. General Guaranty Insurance Co. of Florida, supra; West v. MacMillan, 301 Pa. 344, 152 A. 104 (1926); Appleman, supra § 4261.

THE NATIONAL DEVELOPMENT OF LEGISLATION PERMITTING DIRECT TORT SUITS BY INJURED PERSONS AGAINST TORTFEASORS' INSURERS
The right of an accident victim to bring an action directly against the tortfeasor's insurer has undergone considerable change since the turn of the century. Early on, the rule was clear that the insurance fund could not be reached by an injured party in a direct suit against the insurer (even after judgment against the insured), the theory being that the contract of insurance was limited in its scope to the insurer and the insured, and did not constitute a contract for the benefit of the injured party. James & Thornton, The Impact of Insurance on the Law of Torts, 15 Law & Contemp. Probs. 431, 435 (1950). Thus the injured party could not directly invoke its benefits. Id. See Bain v. Atkins, 181 Mass. 240, 63 N.E. 414 (1902); Clark v. W.R. Bonsal & Co., 157 N.C. 270, 72 S.E. 954 (1911).
Efforts were made, however, to reach the insurance fund through garnishment proceedings against the insurer as garnishee or by equitable proceedings seeking to require the insurer's indebtedness to the insured to be applied pro tanto to the satisfaction of the insured's indebtedness to the plaintiff. James & Thornton, supra at 436. In some cases the plaintiffs were successful. The Minnesota Supreme Court in Anoka Lumber Co. v. Fidelity & Casualty Co., 63 Minn. 286, 65 N.W. 353 (1895), for example, construed the insurance policy as one of insurance against liability, rather than a contract of indemnity, and concluded that the injured party could reach the insurance fund once the insured's liability to the injured party had been established by final judgment. See also Hoven v. Employers' Liability Assurance Corp., 93 Wis. 201, 67 N.W. 46 (1896).
The insurers, however, got around the effect of such decisions by simply putting suitably drawn "no action" clauses in their *350 policies. These provided in substance: "No action shall be against the company as respects any loss under this policy unless it shall be brought by the insured, himself, to reimburse him for loss actually sustained and paid by him in satisfaction of a judgment after trial of the issue." James & Thornton, supra at 436. Confronted with this language, the courts generally took the view that the policy was one of indemnity against loss rather than of insurance against liability. See Luger v. Windell, 116 Wash. 375, 199 P. 760 (1921). Accordingly, the conclusion usually followed that garnishment proceedings by the injured person could not be maintained against the insurer and equitable remedies could not be used to reach the fund. See Allen v. Aetna Life Ins. Co., 145 F. 881 (3rd Cir.1906). Although policies that did not contain the "no action" clause were generally construed to be policies of insurance against liability rather than for indemnity against loss, most policies were written with the "no action" clause, and an injured claimant could rarely obtain relief against the insurer. James & Thornton, supra at 436; Compare Carter v. Aetna Life Ins. Co., 76 Kan. 275, 91 P. 178 (1907) with Blanton v. Kansas City Cotton Mills Co., 103 Kan. 118, 172 P. 987 (1918). Thus, anomalously, if the insured was solvent so that a judgment of damages could be collected against him, the insurance company would pay, but if the insured was insolvent so that the judgment was uncollectable, the company did not have to pay. See Luger v. Windell, 116 Wash. 375, 199 P. 760 (1921); Shea v. United States Fidelity Co., 98 Conn. 447, 120 A. 286 (1923); James & Thornton, id. But see E. Sawyer, Automobile Liability Insurance 2-3 (1936) noting that many companies probably did not choose to take full advantage of the unjust legal situation.
Remedial legislation was brought forth to solve the difficulty at least in part. The general effect of the legislation was to permit the injured party to sue the insurer directly once the insured's liability was established by final judgment, any clauses to the contrary being ineffective. James & Thornton, supra at 437; See Jackson v. Citizens Casualty Co., 277 N.Y. 385, 14 N.E.2d 446 (1938). Such statutes provide that no policy of insurance against loss or damage shall be issued unless it contains a provision that the bankruptcy or insolvency of the person insured shall not release the insurer from the payment of damages and that, after judgment has been obtained against the insured, in case execution is returned unsatisfied, an action can be maintained by the injured person directly against the insurer. James & Thornton, id.
Early legislative efforts focusing on making a bankrupt employer's insurance available to his injured employees were soon engulfed in the larger movement for worker's compensation. See Bradbury's Workmen's Compensation Law (3d ed. 1917) 53-55; Michelbacher and Nial, Workmen's Compensation Insurance (1925) 95-108. With the advent of the automobile and the consequent increase in the amount of liability insurance, came a demand for legislation enabling personal injury creditors of an insolvent tortfeasor to reach his insurance money. See Crobaugh and Redding, Casualty Insurance (1928) 280, 282-83; Huebner, Property Insurance 421 (1922); Vance, Insurance § 275 (2d ed. 1930). The legislatures of twenty-two states responded with statutes permitting a direct suit against the insurer despite the insolvency of the insured. Comment, Legislative Efforts To Make Insurance Guarantee the Payment of Tort Claims, 46 Harv.L.Rev. 1325, 1326 (1933). The statutes of Massachusetts and New York have furnished models for most jurisdictions. Id.

THE LEGISLATIVE HISTORY AND DEVELOPMENT OF THE LOUISIANA DIRECT ACTION STATUTE
The Louisiana Direct Action Statute is the product of a lengthy legislative and judicial process. See McKenzie & Johnson, Louisiana Civil Law Treatise, Insurance Law and Practice § 22 (1986). For the purpose of correcting the injustice created by insurers' avoidance of tort victims' direct suits by use of "no action" clauses in insurance policies the legislature by Act 253 of 1918 enacted the first element of the *351 remedial legislation known as the Direct Action Statute. The 1918 Act prohibited the issuance of any policy of insurance against liability "unless it contains a proviso that the insolvency or bankruptcy of the insured would not release the company from the payment of damages for injury sustained or loss occasioned during the life of the policy," and further provided that "in the case of such insolvency or bankruptcy, an action may be maintained within the terms and limits of the policy by the injured person or his or her heirs, against the insurer company." 1918 La.Acts No. 253, § 1.
In Edwards v. Fidelity & Casualty Co., 11 La.App. 176, 123 So. 162 (Orl.1929) the court of appeal in an action by an injured party against an insurer, rejected the insurer's defenses based on the insured's failure to give timely notice of the claim and the lack of a judgment establishing the insolvency or bankruptcy of the insured. The court reasoned that "the purpose of the statute [is] to create immediately upon the happening of the accident, a cause of action in the injured party against the insurer, if any, of the party at fault. Of course, the right to present and enforce this cause of action is conditioned upon the obtaining of a judgment against the party at fault and upon unsuccessful efforts to collect that judgment...." 11 La.App. at 178, 123 So. at 163; and that an unsatisfied execution of a judgment was satisfactory proof of insolvency.
In the next legislative session, Act 55 of 1930 was enacted, virtually codifying the Edwards decision. See McKenzie & Johnson, supra § 22 at 24. This act added two concepts to the Direct Action Statute: (1) "any judgment which may be rendered against the assured, for which the insurer is liable, which shall have become executory, shall be deemed prima facie evidence of the insolvency of the assured", and (2) "the injured person or his or her heirs, at their option, shall have a right of direct action against the insurer company within the terms and limits of the policy, in the parish where the accident or injury occurred, or in the parish where the assured has his domicile, and said action may be brought either against the insurer company alone or against both the assured and the insurer company, jointly and in solido." 1930 La.Acts No. 55. In permitting a suit against the insurer either alone or jointly with the insured, the Louisiana Direct Action Statute differed significantly from that of most other states. The absence of similar provisions in other statutes reflects the traditional fear that to permit the jury to know that a defendant is protected by insurance will prejudice its consideration of the case. Comment, Legislative Efforts To Make Insurance Guarantee the Payment of Tort Claims, 46 Harv.L.Rev. at 1328; 1 Wigmore, Evidence § 282 (2d ed. 1927); see James & Thornton, supra at 437.
In 1948 the legislature, in an effort to collect and codify the body of laws regulating insurance, adopted the Louisiana Insurance Code of 1948. (1948 La.Acts No. 195) The Direct Action Statute was embodied in the Code as section 14.45 without any change important to the present case. Also incorporated into the Code by the same act was section 1.06, which provided that "[i]nsurance shall be classified and defined as follows: * * * (4) Liability. Insurance against the liability of the insured for the death, injury or disability of an employee or other person, and insurance against the liability of the insured for damage to or destruction of another person's property. * * * (14) Miscellaneous. Any other kind of loss, damage, or liability properly the subject of insurance and not within any other kind or kinds of insurance as defined in this Section, if such insurance is not contrary to law or public policy." 1948 La.Acts No. 195, § 1.06; La.R.S. 22:6 (4), (14). Like the Direct Action Statute, these provisions evidence a primary design to regulate liability insurance related to personal injury and tangible property damage but a certain reluctance or ambivalence toward fixing the ultimate range of the legislation.
The final amendment of significance in the present case occurred in Act 125 of 1958. In that act the present final paragraph of the statute was added: "It is also the intent of this Section, that all liability *352 policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insureds or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy." 1958 La.Acts No. 125.

INTERPRETATION OF THE DIRECT ACTION STATUTE WITH RESPECT TO THE ISSUES IN THE PRESENT CASE
It is well settled that the Direct Action Statute is designed to facilitate the recovery of damages ex delicto; it does not authorize a direct action based solely on a breach of contract. Tyler v. Walt, 184 La. 659, 167 So. 182 (1936); Lacour v. Merchants Trust and Savings Bank, 153 So.2d 599 (La.App. 4th Cir.1963); Pennsylvania Fire Ins. Co. v. Underwriters at Lloyds London, 140 So.2d 212 (La.App. 4th Cir. 1962); McKenzie & Johnson, supra § 30 at 94. When the statute is applicable and authorizes a direct suit against a tortfeasor's insurer, the statute is read into and becomes a part of a policy written pursuant thereto, even though the policy does not contain the language required by the statute, or contains language prohibited by the statute. Olympic Towing Corporation v. Nebel Towing Company, 419 F.2d 230 (5th Cir.1969), overruled on other grounds, 783 F.2d 1296 (5th Cir.1986); Humble Oil & Refining Co. v. M/V John E. Coon, 207 F.Supp. 45 (E.D.La.1962); Dean v. Bituminous Casualty Corporation, 72 F.Supp. 801 (W.D.La.1947); Bosse v. Wolverine Ins. Co., 88 N.H. 98, 184 A. 359 (1936); Perlman v. Independence Indemnity Co. of Philadelphia, 134 Misc. 499, 235 N.Y.S. 194 (1929); Malmgren v. Southwestern Automobile Insurance Co., 201 Cal. 29, 255 P. 512 (1927); Thos. W. Leigh, Direct Actions Against Liability Insurers, 326 Ins.L.J. 633 (1949).
In our opinion the Direct Action Statute is a mandate for a tort victim to bring a direct suit to recover damages for personal injury or corporeal property damage from the tortfeasor's insurer, regardless of whether the insurer has framed the policy as a liability or an indemnity contract. It would lead to absurd consequences to interpret the statute as permitting an insurer to insulate itself from such an action by framing its policy as an indemnity contract or by inserting a "no action" clause in its policy. At the time of Louisiana's first enactment of a direct action statute in 1918, many of the policies issued were indemnity policies requiring that loss actually be sustained, i.e., through the payment of a judgment by the insured. See Webb v. Zurich Insurance Co., 251 La. 558, 205 So.2d 398, 402 (1967); LeBouef v. Colony Insurance Co., 486 So.2d 760, 761 (La.App. 1st Cir.1986); McKenzie & Johnson, supra § 22; Comment, Legislative Efforts To Make Insurance Guarantee the Payment of Tort Claims, 46 Harv.L.Rev. 1325 (1933); James & Thornton, supra at 435-36; Comment, Direct ActionsInsurance Contracts, 13 La.L.Rev. 495 (1953); Leigh, supra, 326 Ins.L.J. 633. The legislative history is clear that the principal object of the statute was to overcome strategems of that kind by insurers to bar tort victims' direct suits to recover for personal injuries and corporeal property damage resulting from automobile collisions and other kinds of harmful impacts. See Webb v. Zurich Insurance Co., supra, 205 So.2d at 403; LeBouef v. Colony Insurance Co., id.; Symeonides v. Cosmar Compania Naviera, S.A., 494 F.Supp. 240 (M.D.La.1980). Louisiana's Act 253 of 1918 was part of a national movement to alleviate the injustice brought about by the increased use of clauses in indemnity contracts requiring actual payment or loss by the insured. See Webb v. Zurich Insurance Co., id., LeBouef v. Colony Insurance Co., id.; Comment, supra, 46 Harv.L.Rev. at 1325-1326; James & Thornton, supra at 436-437. This movement was given its greatest impetus by the advent of the automobile, the consequent increase in the amount of insurance, and the legislative concerns for the need to compensate automobile accident victims. See Comment, supra, 46 Harv.L.Rev. at *353 1326. If the Direct Action Statute were to be rendered ineffective in every case in which the insurer had framed its policy as an indemnity contract, rather than as a liability policy, the statute would be reduced to a toothless absurdity, affording no real protection even to innocent vehicular accident victims, who were intended to be principal beneficiaries of the legislation. See McKenzie & Johnson, supra § 30.
On the other hand, it would stretch the legislative mandate too far to interpret the statute to prohibit "indemnity" contracts and "no action" clauses in situations not involving personal injury or damage to corporeal property. In this respect, it seems unlikely that the legislative aim was to completely abolish such provisions in all forms of liability and indemnity insurance. The statute does not expressly prohibit "indemnity" contracts or "no action" clauses or even address them as general evils to be remedied. In the absence of such an expression, a construction of the statute as absolutely forbidding such contractual provisions in suits to recover for loss or damage to incorporeals, see La.Civ. Code art. 461 (1978), seems overbroad and quite remote from the known subjects of legislative concern, viz., the plight of victims sustaining personal injury or property damage in automobile and other accidents.
Furthermore, the statute is susceptible to other, more reasonable interpretations with respect to whether a direct action against the tortfeasor's insurer is afforded a tort victim suffering only loss or damage to incorporeal property. It seems possible that the legislature either intended to deny this class of tort victims the right to a direct action altogether or that the legislative aim was to permit the parties to the insurance contract to determine whether the particular insurance policy would be amenable to direct suit except in litigation involving the critical areas of concern, viz., personal injury or corporeal damage resulting from vehicular accidents or other trauma. The latter interpretation conforms better to the context in which the statutory language occurs, the text of the law as a whole, and the purpose of the law. There is solid evidence that the legislature intended to abolish the distinction between a contract of insurance against liability and a contract of indemnity against loss for the benefit of personal injury and corporeal property damage victims, but there is little evidence of a legislative aim to do so otherwise. However, it is well settled that the statute is remedial and should be liberally construed to accomplish its purpose of affording a person suffering loss or damage a direct action against a tortfeasor's insurer. See Home Insurance Company v. Highway Insurer Underwriters, 222 La. 540, 62 So.2d 828 (1953); Ralston Purina Company v. Cone, 304 So.2d 735, 738 (La. App. 2nd Cir.1974); Cushing v. Maryland Casualty Co., 198 F.2d 536 (5th Cir.1952), vacated and remanded on other grounds, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954); Lewis v. Manufacturers Casualty Insurance Co., 107 F.Supp. 465 (W.D.La. 1952); Appleman, supra § 4863; Couch, supra § 45:798. It is consistent with the principle of liberal construction to uphold the direct action when an insurer, charged with knowledge of the law, issues a policy specifically insuring against liability, rather than indemnifying against loss, in the face of the Direct Action Statute, which applies to every "policy or contract of liability insurance" and proclaims that "all liability policies within their terms and limits are executed for the benefit of all injured persons". Moreover, because the interpretation of a legislative text strongly resembles the interpretation of a private legal document, we may interpret doubtful provisions in the light of equity, usages and the nature of the provision. See F. Geny, Methode d'Interpretation et Sources en Droit Prive Positif No. 103 (2d ed. La.St.L. Inst. trans. 1963); La.Civ.Code art. 2053. Unless the parties to the insurance contract have agreed unambiguously that the contract shall be an indemnity contract only, it would be inequitable to deny an innocent tort victim the right to bring a direct action against the insurer, even if he has sustained only loss or damage to an incorporeal. Furthermore, it appears that the usage or established practice of our courts would permit a tort victim suffering incorporeal *354 property damage to bring a direct action against the insurer of the alleged tortfeasor when the insurance contract has been framed as one against liability rather than as an unambiguous contract of indemnity against loss. See, e.g., Ralston Purina Company v. Cone, 304 So.2d 735 (La. App. 2nd Cir.1974); Vessel v. St. Paul Fire & Marine Insurance Co., 276 So.2d 874 (La.App. 1st Cir.1973).

APPLICATION OF THE PRECEPTS
Applying the foregoing precepts, we conclude that the loss or damage alleged does not involve personal injury or corporeal property damage, but that the insurance contract is ambiguous as to whether the parties intended that it insure against liability or indemnify against loss with respect to the damage claimed, and that, therefore, the ambiguity should be resolved by interpreting the policy in this respect to be one against liability rather than one of indemnity against loss actually paid by the insured. Accordingly, because we construe the policy to be one of liability with respect to the plaintiffs' claims, it follows that the Direct Action Statute applies to allow them to bring a direct suit against the insurer.
A summary of the arguments of the plaintiffs and the insurance company illustrates that the insurance contract is susceptible to more than one reasonable interpretation. First, the company points out that the "Action Against Company" clause refers to indemnity:
"No action shall lie against the Company, unless as a condition precedent thereto, the Insured shall have fully complied with the terms of this contract. In the event of the bankruptcy or insolvency of the Insured, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency."
Second, the plaintiffs argue that the condition defining the term "Loss" with respect to the relevant coverage is couched in terms of insurance against liability:
"[A]ny amount the Insured is obligated to pay as respects his legal liability, whether actual or asserted, for any negligent act, any error, any omission or any breach of duty, and, subject to the applicable limits and terms of this policy, shall include damages, judgments, settlements, costs of investigation (excluding salaries of officers and employees), and costs, charges and expenses incurred in the defense of actions, suits or proceedings and appeals therefrom."
Finally, the parties draw opposite reasonable inferences from the "Loss Payable" condition:
"Recovery under this contract in respect to claim or loss arising out of any occurrences covered hereunder shall not be made unless and until the Insured's liability has either been rendered fixed and certain by final judgment or admitted by the Company in writing; but in no event shall recovery be made hereunder unless proof of claim is made upon the Company within ninety (90) days after final judgment or admission.
It is not the intention of this Policy that it shall operate as or be construed to be additional insurance. The Company shall not be required to pay any portion of its coverage unless and until the Insured has actually and in fact paid to the claimant or claimants the full limit of its retention. Proof of payment by the Insured of its full liability shall be a condition precedent to any and all liability and claim against the Company under this contract."
Regarding the "Loss Payable" condition, the company argues that the provision requiring that the insured's liability be fixed and certain is consistent with an indemnity contract; that unlike a liability policy the contract permits recovery when proof of claim is made within 90 days after final judgment or admission; and that the final sentence indicates that the contract is an indemnity agreement by providing that proof of the insured's payment of its full liability is a condition precedent to the company's liability.
But the plaintiffs argue plausibly that the proviso requiring that the insured's liability be fixed by judgment or the insurance *355 company's admission in order to bind the insurer is not in conflict with the proposition that the policy is a liability contract. The chief distinction between a liability policy and an indemnification policy is that under a liability policy a cause of action accrues when liability attaches, whereas under an indemnification policy there is no cause of action until the liability has been discharged, as by payment of the judgment by the insured. Meloy v. Conoco, 504 So.2d at 839; Appleman, supra § 4261, p. 72. Furthermore, plaintiffs contend, since recovery against the company is in order when the insured's liability becomes fixed by judgment or the insurer's admission, the final two sentences of the provision cannot be interpreted to require that the insured pay the judgment or the settlement before recovery may be had from the insurance company. Instead, they argue, these sentences refer only to the insured's obligation to pay the full limit of its retention prior to making a claim against the insurer.
From these and other somewhat less cogent arguments of the parties, and from our own examination of the insurance contract, we conclude that the policy is indeed ambiguous and should therefore be interpreted to be a contract of insurance against liability in the present case rather than as a contract of indemnity against loss.

DECREE
For the reasons assigned, we conclude that the plaintiffs are entitled to bring a direct action against the insurance company in this case. Accordingly, the judgment of the court of appeal is reversed, the exception of no right of action is overruled and the case is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED; EXCEPTION OVERRULED; REMANDED TO THE TRIAL COURT.
HALL, J., concurs and assigns reasons.
WATSON, J., concurs in the result for the reasons stated in the original opinion.
MARCUS, J., dissents and assigns reasons.
COLE, J., dissents for reasons originally assigned, and for additional reasons.
HALL, Justice, concurring.
I agree that the insurance policy at issue in this case is a liability policy in the broad sense that the term is used in LSA-R.S. 22:655, and that plaintiffs are entitled to bring a direct action against the insurer. The scholarly and collegiate effort of Justice Dennis to reconcile the differing opinions as to the meaning of the Direct Action Statute is admirable, but I cannot subscribe to the distinction between actions for personal injury and corporeal property damage and actions for damage to incorporeal property. Although actions arising out of automobile accidents might have been the primary motivation for enactment of the statute, the statute as enacted by the legislature makes no such distinction, and the public policy underlying the statute calls for no such distinction. As I wrote several years ago for the court of appeal in Ralston Purina Company v. Cone, 304 So.2d 735 (La.App. 2d Cir.1974):
"Such a narrow construction of the statute is not warranted and is not consistent with the purpose of the statute. The statute is remedial and should be liberally construed to accomplish its purpose, which is to afford an injured person, whether injured physically or otherwise, a direct action against an insurer which has assumed ultimate liability for its insured's torts, whether the torts insured against involve accidents or other activities. There is no more reason for a person physically injured by a negligent driver in an automobile accident to have a direct action against the tort-feasor's automobile liability insurer than for a person financially injured by the negligent acts of the Clerk of Court to have a direct action against the Clerk's errors and omissions liability insurer." 304 So.2d at 738.
*356 MARCUS, Justice (dissenting).
While agreeing with the majority's interpretation of the Direct Action Statute, I disagree with its application in this case. In my view, the policy is not ambiguous. It is clearly an indemnification policy and therefore outside the scope of the Direct Action Statute. Accordingly, I respectfully dissent.
COLE, Justice, dissenting.
For the reasons originally assigned, and for the following additional reasons, I respectfully dissent.
The majority opinion on rehearing fails to address the history and nature of directors and officers policies discussed at length in my original dissent. The nature of D & O policies is critical to a proper analysis of this case. Additionally, I disagree with the majority's conclusion that the insurance contract at issue is ambiguous. In my opinion, there is only one reasonable interpretation of the policy at issue.
Although D & O insurance policies are often labelled "liability" policies, they are designed and intended to be "indemnity" policies. When the intent of the parties to an insurance contract is evident from the terms of the contract, the policy must be given a reasonable interpretation which is consistent with the apparent object and plain intent of the parties. Hemel v. State Farm Mut. Auto. Ins. Co., 211 La. 95, 29 So.2d 483, 485 (1947). A review of the language and provisions of the entire policy, coupled with the unmistakable intent behind the policy, clearly indicates this policy is an indemnity policy and not a general liability policy. Accordingly, the plaintiffs should not be allowed to utilize the Direct Action Statute to sue the bank's insurer directly.
NOTES
[1] When this cause of action arose and later, at the time suit was filed, February 12, 1988, LSA-R.S. 22:655 stated:

No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.
It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy.
[2] Exhibit A.
[3] Quinlan v. Liberty Bank & Trust Co., 545 So.2d 1140 (La.App. 4th Cir.1989).
[4] 550 So.2d 637 (La. 1989).
[5] Exhibit A.
[6] Fidelity National Bank v. Aetna Casualty and Surety Co., 584 F.Supp. 1039 (M.D.La.1984), disposed of an identical argument with this brief statement: "Turning first to trivial issues raised by MGIC [third-party defendant], there is no doubt that MGIC's policy, a `directors' and officers' liability policy,' is a `policy or contract of liability insurance' under La.R.S. 22:655; and since it was issued in Louisiana, the `no action' provisions of MGIC's policy do not bar a direct action by Aetna." Id. at 1042.
[1] For a more detailed statement of the facts, see the court of appeal opinion at 545 So.2d 1140 (La.App. 4th Cir.1989).
[2] At the time this lawsuit was filed, La.R.S. 22:655 provided in part:

No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that.... (emphasis added.)
[3] St. Paul also raised the objection of no cause of action which was not addressed by the trial court.
[4] Act 253 of 1918 made it a misdemeanor

"for any company to issue any policy against liability unless it contain[ed] a provision to the effect that the insolvency or bankruptcy of the assured shall not release the company from the payment of damages ... and, in case of such insolvency or bankruptcy, an action may be maintained within the terms and limits of the policy by the injured person or his or her heirs, against the insurer company."
[5] See McKenzie and Johnson, Louisiana Civil Law Treatise on Insurance Law and Practice at p. 22 § 22.
[6] Id. at p. 92 § 30.
[7] La.R.S. 32:861. A motor vehicle liability bond, or a deposit of funds with the state treasurer, or a certificate of self insurance are also acceptable security.
[8] La.R.S. 6:286, applicable to officers and directors of state banks, provides for both mandatory and permissive or discretionary indemnification of officers and directors. Where a director or officer is wholly successful on the merits of a lawsuit, indemnification for reasonable expenses incurred in connection with the lawsuit is mandatory. Indemnification in other instances is either permissive, or it is precluded.
[9] See Note, "Liability Insurance for Corporate Executives," 80 Harv.L.Rev. 648 (1967).
[10] See J. Bishop, supra, ch. 8, and preface.
[11] The Wyatt Survey found that "only 32% of business corporations with assets under $25 million carry D & O insurance." Knepper, supra, note 11, at 749. See also, Bishop, supra, note 8, ch. 8.
[12] La.R.S. 6:287 requires state banks "to obtain and maintain a fidelity bond ... covering each officer and employee who has charge of or who handles cash or securities of the bank...." This requirement protects the bank and its depositors from the dishonesty (e.g. embezzlement) of bank employees. It does not protect investors from the negligence or misconduct of the bank's officers and directors.
[13] See Bishop, supra, note 8 § 8.01[1].
[14] Cf. Okada v. MGIC Indem. Corp., 795 F.2d 1450 (9th Cir.1986), in which the court found a duty to defend in the D & O policy at issue because such a duty was not expressly negated by the terms of the policy. A dissent attacked this ruling as "the worst form of judicial activism by a federal court." Id. at 1458. The majority opinion was reissued a year later with substantial amendments. Although the court found the D & O policy at issue was a liability policy under Hawaii law, there was no mention of a "duty to defend." Okada v. MGIC Indem. Corp., 823 F.2d 276 (9th Cir.1987), discussed in Knepper, supra. See also Zaborac v. American Cas. Co. of Reading, Pa., 663 F.Supp. 330 (C.D. Ill.1987), where the court chose to follow the reasoning of the dissent in the original Okada opinion before Okada was amended and reissued; and FSLIC v. Mmahat, 97 B.R. 293 (E.D. La.1988) (order & reasons regarding policy exclusions) where the court stated, "Fifth Circuit precedent and applicable Louisiana law require the conclusion that the American Casualty policy is an indemnity policy rather than one containing the broader duty to defend." Id. at p. 300.
[15] The St. Paul policy is captioned "Directors' and Officers' Liability Policy." In the context of its substantive indemnity provisions, this label can only be intended to mean any "liability" of the directors and officers is subject to indemnification. To apply the opposite meaning equates to a nullification of the policy's contractual provisions which are not contra bonos mores or contrary to public policy, and thus protected by constitutional constraints against the impairment of obligations of contracts. U.S. Const. Art. I, § 10, cl. 1; LSA-Const. Art. I, § 23.
[16] The St. Paul policy provides:

The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured, but the Company shall have the right and shall be given the opportunity to associate with the Insured in the defense and control of any claim, suit, or proceeding where the claim or suit involves, or appears reasonably likely to involve, the Company, in which event the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding. (emphasis added.)
Separate counsel was retained to provide a defense for the insured in this case.
[17] The St. Paul policy defines "loss" as follows:

Under Insuring Agreement 1A, any amount the Insured is required or permitted to pay to a Director or officer as indemnity according to applicable law ... or under the Corporation(s) charter or By-Laws ... for a claim(s) against him, whether actual or asserted, and subject to the applicable limits and terms of this policy, shall include damages, judgments, settlements, costs of investigation ... and costs, charges and expenses incurred in the defense of actions, suits or proceedings and appeals therefrom.
Under Insuring Agreement 1B, any amount the Insured is obligated to pay as respects his legal liability, whether actual or asserted, for any negligent act, any error, any omission or any breach of duty, and, subject to the applicable limits and terms of this policy, shall include damages, judgments, settlements, costs of investigation ... and costs, charges and expenses incurred in the defense of actions, suits or proceedings and appeals therefrom. (emphasis added.)
[18] Before the law of insurance was as developed as it is today, courts in other jurisdictions held that where an insurer exercised exclusive control of the investigation and defense of a lawsuit against its insured, or where the policy provided for a duty to defend, the insurance contract was one of liability rather than indemnity. Malley v. American Indemnity Corp., 297 Pa. 216, 146 A. 571 (1929); Blanton v. Kansas City Cotton Mills Co., 103 Kan. 118, 172 P. 987 (1918); Patterson v. Adan, 119 Minn. 308, 138 NW. 281 (1912).
[19] The court in Malley v. American Indemnity Corp., supra, note 15, discussed the concept of "loss" within the terms of an insurance contract, stating, "Loss does not have an inflexible meaning.... Any shrinkage in value of estate or property may on proper occasions be rightfully so termed." See note 21, infra.
[20] Some D & O policies provide the insurer with the option of advancing defense costs provided, however, the directors and officers repay the insurer for such advances if it is finally established that the insurer has no liability under the policy. See Knepper, supra, at 553-54, § 17.04; Zaborac, supra; and Continental Casualty, supra. Some D & O policies also contain a clause under which the bankruptcy or insolvency of the insured does not release the insurer from payment of a judgment to a third party. The St. Paul policy contains a clause like this. Although these clauses are typically found in liability policies, we noted in Arrow Trucking Co. v. Continental Ins. Co., 465 So.2d 691 (La.1985), "This clause does not change the nature of the reinsurance agreement from one of indemnity for loss to one of indemnity for liability." Id. at 699.
[21] See also Malley, supra, note 18, where the defendant insurer, claiming the policy at issue was an indemnity rather than a liability policy, refused to satisfy a judgment against its insured because the insured had not yet paid the judgment himself. The insurance company admitted, however, "that where the assured is perfectly solvent the practice of the company is to carry the defense to a successful issue by paying the judgment without stopping for the assured to pay it." Id. 146 A. at 572.
[22] The court quoted from Hidalgo v. Dupuy, 122 So.2d 639 (La.App. 1 Cir.1960) to support its analysis. Hidalgo involved a personal injury resulting from an automobile accident, precisely the scenario the legislature had in mind when it enacted the Direct Action Statute.
[23] The majority states, "under Section B, St. Paul agrees to pay on behalf of the insured bank...." This is an incorrect statement of the terms of the policy. Under Coverage 1B, the insurer agrees to pay on behalf of "The Insured (as defined in Insuring Agreement II B 2)...." Insuring Agreement II B 2 provides:

Under Coverage 1 BEach and every person who was, is or may hereafter be an Officer or Director of the Corporation(s) named in Item 1 of the Declarations....
Thus, under Coverage 1B, St. Paul has agreed to pay on behalf of the officers and directors directly, even where the bank chooses not to indemnify them. Under Coverage 1B, St. Paul is not paying on behalf of the insured bank, as Coverage 1A provides for this. Coverage 1B becomes applicable only where Coverage 1A is inapplicable.